UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VILMA REYES, PATRICIA MARTINEZ,    )
RAMON BREA, and BORYS PEREZ,       )
                                   )
          Plaintiffs,              )    CIVIL ACTION NO.
                                   )    12-11715-DPW
     v.                            )
                                   )
S.J. SERVICES, INC., SHAWN SHEA    )
and DAVID SHEA,                    )
                                   )
          Defendants.              )


MEMORANDUM AND ORDER
September 22, 2014

     The plaintiffs in this putative class action are individuals employed as cleaners by SJ Services, Inc.  Believing that they have not been properly compensated by their employer for the time that they worked, they have brought claims against SJ and its officers, Shawn and David Shea, under the Massachusetts Wage Act. They have moved for summary judgment on their claims and the defendants have filed a cross motion for summary judgment.

     Plaintiffs' primary dispute concerns wages owed to unionized employees.  A sub-set of non-unionized plaintiffs have brought claims that they too were underpaid for hours worked and also that they were promised, but not provided, health benefits.

     Before undertaking to address the merits of this dispute directly, I must first determine whether any of the claims are preempted by the federal Labor Management Relations Act; to the

degree preemption applies to any claims, these claims must be dismissed in the circumstances of this case. And, if preemption is not applicable to some portion of plaintiffs' claims, I must determine whether any remaining state law claims should be remanded to State Court.

## I. FACTUAL BACKGROUND

A detailed discussion of the underling facts is necessary to frame the issues before me.

The plaintiffs are employed by SJ as cleaners of buses, bus shelters, and train platforms for the MBTA. Vilma Reyes, Patricia Martinez, and Borys Perez have been employed by SJ since November 2011. Ramon Brea was employed from December 2009 through his termination in July 2012. He was rehired shortly thereafter and continues to be employed by SJ.

Ms. Reyes and Ms. Martinez have been and continue to be members of a union. Mr. Brea was a member of a union until November 2011, at which time he assumed a non-union position. Mr. Perez was a member of a union until he assumed a non-union position in August 2012.

### A. Contentions Regarding Hours Worked and Paid

The amount that each plaintiff was paid each week is recorded in a payroll register maintained for SJ by a payroll services firm. That register provides the names of SJ employees

as well as their employee identification numbers, and indicates the hourly rate, the number of hours, and their total earnings (calculated by multiplying the rate times the hours) as well as deductions for items such as federal and state income taxes, Medicare, Social Security, and union fees. According to the testimony of David Shea each dated entry refers to the information for the prior week. In certain instances, more than one rate is listed on a single payroll entry; for instance, the payroll entry dated January 11, 2013 indicates that Ms. Reyes received pay of $15.95 per hour for six hours of work, and $16.15 per hour for twelve hours of regular work, six hours of holiday and six hours of sick leave.

The payroll entries do not indicate how either the rate or the number of hours for the employees were determined. Mr. Shea, in particular, testified that he did not know how the rates in the payroll sheets were determined, but said that the hourly rate indicated on the payroll entries was the rate to which the plaintiffs were entitled and which they were actually paid. The plaintiffs themselves did not know how their pay rate was determined or when and why their pay rate changed.

The plaintiffs were assigned work schedules, which varied over the course of their employment. In addition to their scheduled shifts, the plaintiffs appear to have worked and been

compensated for occasional additional work on special projects, which are reflected in the payroll reports.

Ms. Reyes and Ms. Martinez testified in their depositions that, in addition to their scheduled shifts--reflected in the payroll reports--they began working five to ten minutes before each scheduled shift and continued to work for fifteen to thirty minutes after each shift. Ms. Reyes testified that, when this time is taken into account, her total weekly working hours were 31.5 hours, even though she was scheduled and paid for thirty hours. Mr. Brea testified that, at different times during his employment, he worked for an additional five to forty-five minutes past his scheduled shifts and for ten minutes before his scheduled shifts began. Mr. Perez testified that, during the time he was working a five day per week schedule, he worked an additional ten to fifteen minutes before the scheduled start of his shifts and up to ten minutes after the end of his scheduled shift.

In addition to their own testimony, the plaintiffs rely on testimony from their supervisors at SJ suggesting that the plaintiffs could not have performed their assigned tasks within the time limits of their scheduled shifts and therefore must have worked more than their scheduled--and compensated--time. They also point to this testimony as demonstrating that their supervisors at SJ knew that they were working beyond their

scheduled shifts because the amount of work could not be completed in the scheduled time. For example, Ms. Reyes testified that she was expected to clean six buses per shift when she was working at the Albany Street garage and her supervisor estimated that it required between one-and-a-half and two hours to clean a bus. The mathematical inference is that six buses could not be cleaned without working more than six hours, indeed the arithmetic suggests that between nine and twelve hours would be necessary to perform the tasks. Similarly, Alfredo Pena, another SJ employee and supervisor, testified that he and Mr. Brea were expected to clean between thirty-six and thirty-nine train platforms and that each platform required fifteen to twenty minutes to clean. Again, the arithmetic suggests that the tasks assigned for a six hour shift would take between nine and thirteen hours to accomplish.

The defendants counter this evidence in several ways. They point to testimony indicating that cleaners, such as the plaintiffs, are not permitted to work outside of their scheduled shifts. Cleaners know how to contact supervisors, are in regular contact with their supervisors, and are required to report any deviation from their scheduled shifts to those supervisors. Supervisors, in turn, are required to record any departure from a scheduled shift and to make adjustments to spreadsheets recording actual hours worked. Mr. Pena was unable to point to a single

instance of an employee complaining that the employee's paycheck did not reflect the actual hours worked. In addition, upon realizing that their estimates produced such large figures for the total time required to complete the work assigned on a single shift, Mr. Pena and Mr. Sanz recanted or modified their estimates of the amount of time required to perform cleaning tasks either during their deposition or in errata sheets submitted after the deposition was completed. Defendants also contend that the estimated numbers cannot be correct because no direct evidence suggests that any worker worked several hours beyond the worker's shift.

Defendants also point to facts that they believe indicate that plaintiffs were, at times, overcompensated for the hours they actually worked. First, they claim that employees were compensated for their entire shift despite the fact that all scheduled shifts included a half-hour meal break during which employees were not expected to work. The plaintiffs testified, however, that they often worked through the meal break. Ms. Reyes, Ms. Martinez, and Mr. Perez testified that they usually only took two breaks per week. Mr. Brea testified that he took two or three lunch breaks per week during the times that he worked on the B, C, and E line, but took breaks almost daily when working at the Southhampton garage.

Second, in addition to highlighting conflicting testimonial evidence regarding the amount of hours actually worked by the plaintiffs, defendants point to data from biometric hand-scanners that were installed at the MBTA stations where plaintiffs work. These scanners recorded the time when employees entered and left MBTA facilities. While the plaintiffs appear not to dispute that these machines were accurate when operable, they testified that they were frequently malfunctioning. These scanners also were not available throughout the plaintiffs' tenure with SJ and were not available at all the locations at which they worked. In addition, as defendants admit, the data recorded is often facially implausible, indicating, for example, that an individual was only checked in for a minute, or conversely stayed checked in for multiple days. Despite the defects in the data, the defendants have provided tables summarizing and analyzing the hand-scanner data.[1]

_____

[1]     The hand-scanner data--received in response to a subpoena issued to the MBTA--is attached to the affidavit of Barry Miller, SJ's attorney in this matter.  Mr. Miller's affidavit provides a summary of relevant deposition testimony, a narrative description of the hand-scanner data, and a discussion of the results of an analysis of that data performed by the defendants and attached as Exhibit C to Mr. Miller's affidavit. The basis for Mr. Miller's understanding of the hand-scanner data and the foundation for the opinions he offers in his affidavit, including the analysis in Exhibit C, is unclear.  I have concerns generally about the propriety of relying on "evidence" that is presented directly by attorneys of record in a case.  At the very least, if defendants intended to rely upon this evidence for summary judgment, an appropriate witness, other than Mr. Miller, should have provided it.  I therefore simply note here the

This tabular analysis (limited to those weeks in which defendants believe that they have valid data) indicates that in some weeks the amount of time that the plaintiffs were checked-in exceeded the number of hours for which they were paid. In other weeks, the converse is true. According to the defendants, when the overpayment weeks are set-off against the underpayment weeks, on net, Mr. Brea, Ms. Martinez, and Ms. Reyes were paid for more hours than they were checked in--that is, they were overpaid. When an additional deduction is made for two half-hour lunch breaks, Mr. Perez was also overpaid.

**B.    *Health Insurance for Non-Union employees***

SJ offers health insurance to all full-time non-union employees. According to Schedule A of the SJ Services, Inc. Health and Welfare Benefits Plan, employees become eligible to participate in the health plan on the first day of the month following 60 days of employment.

Two non-union employees, Mr. Perez and Mr. Brea, claim that they were not given health insurance benefits by SJ despite being eligible to receive them. Mr. Perez says that he asked his supervisor, Mr. Pena, about signing up for health insurance benefits once he became eligible by working over thirty hours a week during the summer of 2012. At that time, Mr. Pena told him

existence of this data and a possible conclusion that might be
drawn from it without placing weight on the specifics of Mr.
Miller's affidavit.

that he would get medical benefits.  Mr. Brea similarly discussed
health insurance benefits with his supervisor, Mr. Sanz, in July
2010, once Mr. Brea became eligible due to his full-time
schedule.  At that time, according to Mr. Brea, Mr. Sanz told Mr.
Brea that health insurance benefits would be made available to
him.

Neither Mr. Brea nor Mr. Perez were given additional
information about signing up for health insurance benefits until
February 2013, when they received the Health Insurance Open
Enrollment Package.  Mr. Perez declined SJ's offer of benefits at
that point because he had obtained insurance through MassHealth
in January or March of 2013.  Mr. Brea enrolled in SJ's health
insurance program on February 24, 2013.

## B. *The Collective Bargaining Agreement*

A collective bargaining agreement exists between Maintenance
Contractors of New England, a coalition of employers of
maintenance workers, and the Service Employees International
Union Local 615.  The CBA sets forth the pay schedule for
workers.  Under that agreement, an employee's pay rate is
dependent upon a category reflecting the hours regularly
scheduled for work per week, the location or nature of the work,
and seniority.

The CBA also sets up a "Grievance Procedure" for disputes
"concerning the interpretation, application or a claimed

violation of a specific provision of this Agreement," which "shall be the exclusive method for the presentation and settlement of grievances." Without setting forth the specific procedures mandated by the CBA, it is sufficient for present purposes to observe that those procedures require that a grievance first be pursued in a series of steps culminating in arbitration and that plaintiffs have not pursued their claims through the grievance processes set out in the CBA.[2]

## II.  PROCEDURAL BACKGROUND

The first complaint in this matter was filed in state court on behalf of seven plaintiffs--Ms. Reyes, Ms. Martinez, Mr. Brea, and Mr. Perez, as well as Hector Diaz, Jose Luis Galdames, Hugo Laureano, and Elmer Pineda.  The defendants removed the case to federal court on the basis of preemption.

---

[2] The record shows that Ms. Reyes approached her union with a complaint that she was not being compensated for the full amount of her time worked.  In her discussion with her union, however, the union calculated Ms. Reyes as having worked 27.5 hours per week when her breaks were accounted for and suggested that instead of being owed additional compensation, she might owe SJ.  Based on this response, Ms. Reyes did not pursue her complaint with the union.  In its response to defendants' statement of facts, the plaintiffs moved to strike the testimony relating to Ms. Reyes' complaint to the union as hearsay.  I conclude that the statement is not to be considered for the truth of the matter, *i.e.* that she actually owed SJ for the lunch breaks, but to show that a dispute exists here about whether and how the lunch breaks should be counted and that the plaintiff's collective bargaining representative had been approached about how to resolve it.

Defendants then moved to dismiss the complaint, asserting
that the claims were preempted by Section 301 of the Labor
Management Relations Act, 29 U.S.C. § 85(a) and under the *Garmon*
preemption doctrine, *San Diego Bldg. Trades Council* v. *Garmon*,
359 U.S. 236 (1959).  In response, the plaintiffs amended their
complaint on January 11, 2013.

The First Amended Complaint (which is the operative pleading
before me) asserts three claims: (A) a claim under the
Massachusetts Wage Act, Mass. Gen. Laws c. 149 on behalf of those
plaintiffs who are unionized employees of SJ; (B) a claim under
the state Wage Act on behalf of non-unionized plaintiffs; and (C)
a claim under the state Wage Act and, alternatively, under ERISA
on behalf of non-unionized plaintiffs that the defendants failed
to provide promised health insurance benefits.

Defendants moved to dismiss the first amended complaint on
January 25, 2013 contending both that the asserted claims were
preempted and that the bare-bones complaint failed to satisfy the
pleading standards established by the Supreme Court in *Ashcroft*
v. *Iqbal*, 566 U.S. 662 (2009), and *Bell Atlantic Corp.* v.
*Twombly*, 550 U.S. 544 (2007).

During a hearing on March 27, 2013, I took the motion to
dismiss under advisement and directed that the plaintiffs,
following focused discovery, file a motion for summary judgment.
On June 24, 2013, before the plaintiffs filed their summary

judgment motion, I dismissed with prejudice the claims asserted by Hector Diaz, Jose Luis Galdames, Hugo Laureano, and Elmer Pineda because of their failure to cooperate with the discovery process.

On September 3, 2013, the plaintiffs filed a motion for partial summary judgment requesting a determination that the Wage Act claims are not preempted by the Labor Management Relations Act, that the claims of the non-unionized plaintiffs for health insurance benefits assert rights protected by the Massachusetts Wage Act and are not preempted, and for a finding of liability on the plaintiffs' claims. Defendants filed an opposition to plaintiffs' motion and a cross-motion for summary judgment. In addition, SEIU Local 615 has filed *amicus* briefs in support of the plaintiffs.

Finally, plaintiffs have filed a motion to strike the defendants' Rule 68 offers.

### III. ANALYSIS

### A. *Preemption Under the Labor Management Relations Act of the Massachusetts Wage Act Claims of the Unionized Plaintiffs.*

Defendants contend that the claims brought under the Massachusetts Wage Act by the unionized plaintiffs, Ms. Reyes and Ms. Martinez, are preempted by the Labor Management Relations Act and should be dismissed.

<u>1.</u>   <u>The Massachusetts Wage Act</u>

Massachusetts General Laws c. 149, § 148 provides that

"[e]very person having employees in his service shall pay . . . each such employee the wages earned" within a fixed period of time. "The purpose of the Wage Act is 'to prevent the unreasonable detention of wages.'" *Melia* v. *Zenhire, Inc.*, 967 N.E.2d 580, 587 (Mass. 2012) (quoting *Boston Police Patrolmen's Ass'n* v. *Boston*, 761 N.E.2d 479, 481 (Mass. 2002)). Section 150 of the Wage Act authorizes the filing of a private suit by an aggrieved employee and provides for the award of treble damages, as well as costs and attorneys' fees, to a prevailing plaintiff. Mass. Gen. Laws c. 149, § 150.

The strictures imposed by the Wage Act are nonnegotiable and nonwaivable. "No person shall by a special contract with an employee or by any other means exempt himself from this section or from section one hundred and fifty." Mass. Gen. Laws c. 150, § 148. An agreement to circumvent the Wage Act is illegal even when "the arrangement is voluntary and assented to." *Camara* v. *Attorney Gen.*, 941 N.E.2d 1118, 1121 (Mass. 2011).

2.  The Scope of Preemption Under the LMRA

Section 301 of the Labor Management Relations Act confers federal jurisdiction over suits for violation of contracts between an employer and a labor organization, providing:

> Suits for violation of contracts between an employer
> and a labor organization representing employees in an
> industry affecting commerce as defined in this chapter,
> or between any such labor organizations, may be brought
> in any district court of the United States having
> jurisdiction of the parties, without respect to the

> amount in controversy or without regard to the
> citizenship of the parties.

29 U.S.C. § 185(a).

The Supreme Court has treated § 301 as, in addition to conferring jurisdiction upon federal courts, a mandate for the development and application of federal common law regarding labor matters and as a warrant for removing claims preempted by § 301 to federal court. *See Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 211 (1985). In *Lueck*, the Supreme Court determined that an employee's claim that his employer had breached a duty of good faith by improperly handling his insurance claim, a tort under state law, was preempted by the LMRA. Because the extent of the duties allegedly breached "depend[ed] upon the terms of the agreement between the parties" and "[t]he duties imposed and rights established through the state tort . . . derive from the rights and obligations established by the contract," the validity of the claims were to be determined according to federal labor law and the state law claims were preempted. *Id.* at 216 & 218.

In *Lueck* and succeeding cases, however, the Supreme Court recognized that the LMRA did not preempt all disputes between a unionized employee, working under a collective bargaining agreement, and the worker's employer. Rather, the Supreme Court in *Lueck* described the relevant determination as whether "the [state law] tort action for breach of the duty of good faith as applied here confers nonnegotiable state-law rights on employers

-14-

or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract."  471 U.S. at 213.

Applying these principles in a decision after *Lueck* relating to a retaliatory discharge claim, the Supreme Court explained that none of the elements of such a claim "requires a court to interpret any term of a collective-bargaining agreement . . . the state-law remedy . . . is 'independent' of the collective-bargaining agreement in the sense of 'independent' that matters for § 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement." *Lingle* v. *Norge Div. Of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988).

In *Lingle*, the Supreme Court made clear that state-law remedies are not preempted merely because they overlap with contractual remedies subject to federal law.  "[E]ven if the dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes."  *Id.* at 409-410.  Similarly, the Court explained that a state law remedy will not be preempted simply

because the calculation of damages--as opposed to determination of liability--turns upon interpretation of a collective bargaining agreement. "A collective-bargaining agreement may, of course, contain information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled. Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state-law claim, not otherwise pre-empted, would stand." *Id.* at 413, n. 12.

The Supreme Court has since restated and elaborated upon these principles in *Livadas* v. *Bradshaw*, 512 U.S. 107 (1994). There, claims were brought under a state law requiring that an employer pay an employee all wages owed to her immediately upon her discharge. *Livadas*, 512 U.S. at 111. The Court concluded that the employee's claim was not preempted because "[t]he only issue raised . . . was a question of state law, entirely independent of any understanding embodied in the collective bargaining agreement" and "[b]eyond the simple need to refer to bargained-for wage rates in computing the penalty, the collective-bargaining agreement is irrelevant to the dispute." *Id.* at 124.

For its part, the First Circuit has addressed preemption under the LMRA in a series of cases. In *Haggins* v. *Verizon New*

*England, Inc.*, the court explained that a state law claim depends on the meaning of a collective bargaining agreement (and therefore would be preempted) if either "(1) 'it alleges conduct that arguably constitutes a breach of duty that arises pursuant to a collective bargaining agreement,' or (2) 'its resolution arguably hinges upon an interpretation of the collective bargaining agreement.'" 648 F.3d 50 (1st Cir. 2011) (citing *Flibotte* v. *Pennsylvania Truck Lines, Inc.*, 131 F.3d 21, 26 (1st Cir. 1997)).

The First Circuit addressed in *Cavallaro* v. *UMass Mem'l Healthcare, Inc.*, 678 F.3d 1, 7 (1st Cir. 2012) whether claims brought under the Massachusetts Wage Act seeking compensation for meal breaks, training sessions, and work performed before and after shifts were preempted by the LMRA. The court explained that the law governing preemption of nonwaivable provisions (such as the Wage Act) is "evolving and it is not easy to tell in what direction the Supreme Court may go." *Id.* at 7. Faced with such uncertainty, the First Circuit has "continued to treat state regulatory claims in the economic area as preempted where they were intertwined with the CBA and more than mere consultation of the CBA is required." *Id.* at 8 (citing *Adames* v. *Executive Airlines, Inc.*, 258 F.3d 7, 12-16 (1st Cir. 2001)). Finding the claims preempted, the court distinguished *Livadas* on the basis that *Cavallaro* presented a "a very different situation than

*Livadas*, where the wages had been paid, there was no dispute about the amount, and the claim turned on whether the wages had been timely paid under the terms of the state law." *Id.* (citing *Livadas*, 512 U.S. at 124-25). Unlike *Livadas*, "determining what (if anything) is owed . . . depend[ed] at least arguably on interpretations and applications of the CBA at issue," *id.*, and, accordingly, the claims in *Cavallaro* were considered preempted.

In reaching this conclusion, the First Circuit in *Cavallaro* rejected the contention that the claims presented no "interpretive dispute" about the CBA or the calculation of wages, but only "a factual dispute as to whether plaintiffs were paid for time spent working through meal breaks, before and after work, and during training sessions." *Id.* at 8. As the court explained, these factual disputes required interpretation of the CBA's terms regarding whether such items as meal breaks and training sessions were compensable. In addition, even resolution of the factual disputes would not resolve the Wage Act claims. "Determining whether there are wages owed thus would require construing and applying the various 'peculiarities of industry-specific wage and benefit structures' embodied in the CBA." *Id.* (citing *Adames*, 258 F.3d at 13). Going further, the First Circuit explained that "any claim for compensation above the state minima must be entirely dependent on the CBA." *Id.*

### 3. Application to Plaintiffs' Wage Act Claims

#### a. *The Nature of the Factual Evidence and Dispute*

A successful claim under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, requires an employer to, "among other things, prove there are wages owed." *Cavallaro*, 678 F.3d at 8. The plaintiffs contend that their claim that they are owed wages for hours worked beyond their scheduled shifts can be resolved without reference (whether by "consultation with" "interpreting" or "applying") to the CBA. The parties agree that the wage rates reflected in the payroll are accurate. Plaintiffs argue that all that is required is a comparison of the hours for which the plaintiffs were paid--which appears to be captured fully by the payroll reports--with the hours that the plaintiffs actually worked as established by the testimonial and other evidence. If the actual hours worked exceed the paid hours, plaintiffs claim that they succeed on their claims. They contend that as in *Livadas*, where "the primary text for deciding whether Livadas was entitled to a penalty was not the [CBA], but a calendar," 512 U.S. at 115, the primary text for determining liability in this case is not the CBA, but the payroll reports, and the testimony and other evidence regarding the actual hours worked.

This focus on the factual dispute over hours worked is reflected in the summary judgment submissions presented by both parties. Plaintiffs have measured the hours recorded in the

payroll sheets against their own testimony--attesting that they arrived early and stayed late in order to complete their assigned tasks--and against testimony from their supervisors which, based upon estimates of the time taken to perform tasks and the number of tasks assigned to the plaintiffs, suggest that plaintiffs must have worked longer than their assigned shifts.  Nowhere in their argument do plaintiffs point to any terms of the CBA as necessary support for their claims of liability.

While defendants mention various CBA provisions in discussing preemption, their substantive opposition to plaintiffs' claims do not invoke any specific terms of the CBA in arguing against plaintiffs' position.  They focus instead on the factual dispute about hours worked.  The defendants argue that plaintiffs took half-hour lunch breaks during their work week and that this break time offsets any extra time that plaintiffs accrued by arriving early and leaving late.  In addition, the defendants point to the data recorded by the MBTA's hand scanners, which they contend show that plaintiffs have actually worked fewer hours than their schedules and payroll reports indicate--and thus that the plaintiffs have been paid for *more hours* than they actually worked.

The central dispute in this matter--as set forth by the parties--concerns the hours worked, which on the surface seems to be calculable without reference to the CBA itself.  *See Hawaiian*

*Airlines, Inc.* v. *Norris*, 512 U.S. 246, 261 (1994) ("'purely factual questions' about an employee's conduct or an employer's conduct and motives do not 'requir[e] a court to interpret any term of a collective-bargaining agreement.'" (quoting *Lingle*, 486 U.S. at 407)).  I must, however, dig a bit deeper to address the two questions central to the preemption analysis.

> b.  *Do Plaintiffs' claims allege a breach of a duty created by the CBA and without an existence independent of the agreement?*

The plaintiffs present their claim as seeking merely to enforce their nonnegotiable state law right to the wages they have already earned.  Defendants, however, argue that the rights sought to be vindicated arise and exist solely by virtue of the CBA.  This disagreement about the source of the rights they seek to enforce is significant because the Supreme Court has held that "a state-law tort action against an employer may be pre-empted by § 301 if the duty to the employee of which the tort is a violation is created by a collective-bargaining agreement and without existence independent of the agreement." *United Steelworkers* v. *Rawson*, 495 U.S. 362, 369 (1990).  Plaintiffs seek wages at the "regular rate" specified in the CBA, which significantly exceeds the state minimum wage.  The wage rates are not disputed in this case, and plaintiffs' right to receive wages at that rate is a result of the negotiated agreements memorialized in the CBA.

In *Cavallaro,* the First Circuit stated that "any claim for compensation above the state minima must be entirely dependent on the CBA." 678 F.3d at 8. At first glance, this statement might seem to apply to preempt any claim for recovery of contractual wages, such as those that the Supreme Court found not to be preempted in *Lingle* and *Livadas*. The relevant distinction between *Lingle* and *Livadas* on the one hand, and *Cavallaro* on the other, is that in the former cases, liability was created by operation of state law independent of the contract. The claim in *Lingle* was that the employee was terminated for unlawful reasons and paid nothing. In *Livadas*, the employer failed to pay amounts owed within the time prescribed by state law. Liability, therefore, was determined by measuring the employers' conduct against the minimal obligations of state law. The claims of the plaintiffs in *Lingle* and *Livadas* would have existed even in the absence of a contract. The court only needed to look to the CBA to calculate damages once liability had been determined, and referring to the CBA for purposes of establishing damages does not preempt an otherwise valid state law claim. *Lingle*, 486 U.S. at 413, n. 12.

In *Cavallaro*, by contrast, the core issue of liability depended on whether plaintiffs were paid the proper amount--an inquiry that requires the court to measure the conduct of the employer (the amount it has paid) against the duty imposed by the

contract (to pay some certain amount), rather than against a duty imposed by state law.

The key inquiry, then, is whether a determination of liability involves looking to a substantive floor created by state law or one created by a CBA. In *Cavallaro*, the substantive floor was set by the CBA; the Massachusetts Wage Act was invoked as a mechanism to enforce the duties established in that agreement.[3]  This case is similar in that regard to *Cavallaro*. The determination of liability must be made by measuring SJ's performance (the amount paid) against the duty imposed by the CBA (to pay some certain amount).  Plaintiffs' suit is an attempt to obtain the amounts owed by virtue of the CBA--not to seek a remedy for a violation of a minimum obligation imposed by state law.  The plaintiffs may not avoid this result by "'relabeling' as tort suits actions simply alleging breaches of duties assumed in collective-bargaining agreements."  *Livadas*, 512 U.S. at 123. Because plaintiffs' claims seek to enforce the promises made in

---

[3]    This same pattern focusing on the source of the right at issue is apparent in other relevant cases cited by the parties. *Compare*, *e.g.*, *Ralph* v. *Lucent Technologies, Inc.*, 135 F.3d 166 (1st Cir. 1998) (claims arising under Mass. Gen. Laws c. 151B, § 9 and the Americans with Disabilities Act were not preempted) *with, e.g., United Steelworkers* v. *Rawson*, 495 U.S. 362, 369 (1990) (finding preempted state law claims that defendant negligently performed duty created by CBA); *Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 211 (1985) (finding preempted state law claims that defendant breached duty of good faith in performance of obligations under CBA).

the CBA and therefore depend upon that agreement, the
Massachusetts Wage Act claims are preempted by § 301.

> *c.   Does resolution of this claim concerning wages owed
> arguably require interpretation of the Collective
> Bargaining Agreement?*

The second preemption inquiry independently leads to the
same conclusion.  The defendants assert that time spent on lunch
breaks--for which the plaintiffs were paid--should be set off
against any extra time worked before or after shifts.  The data
presented by the defendants suggests that amounts of time spent
on lunch breaks may be sufficient to offset fully any extra time
plaintiffs spent working before and after shifts.

This defense is similar to that proposed by the defendant in
*Cavallaro*, in which the defendant argued that additional
compensation, such as for premium pay above the state mandatory
rate or additional pay for certain shifts, offset any
uncompensated time the plaintiffs might be claiming.  678 F.3d at
8.  In *Cavallaro*, however, the defendants identified specific
provisions of the collective bargaining agreement which would
have to be interpreted to determine the appropriate treatment of
such offsets.  *Id.*  Here, by contrast, the defendants have
pointed to no provisions of the CBA which address expressly
whether the employee plaintiffs must be paid for lunch breaks and
whether overpayments from one week may offset underpayments from
another.  And while defendants contend that time spent on lunch

breaks is non-compensable and should be deducted from the working hours when determining whether plaintiffs have been properly compensated, at least one plaintiff, Mr. Brea, clearly testified to his understanding that he would be paid for time spent on his half-hour lunch break. My review of the CBA indicates that it is, in fact, silent on the issue whether plaintiffs were to be compensated for time spent on their lunch breaks.[4]

Plaintiffs argue that using the lunch break as offsets is without any legal foundation. The Supreme Judicial Court has held that an employer could not make an agreement with his employees pursuant to which the employer would deduct accident-related damages from his employees' earned wages. *Camara*, 941 N.E.2d 1118. Plaintiffs contend that time spent on lunch breaks should be treated in the same manner as the "offsets" in *Camara*, which were not permitted under Massachusetts law.[5]

---

[4] Section 7.1 of the CBA, under the header "Wages," states only that "Wages, during the term of this agreement, shall be paid as set forth in Appendix 'A', attached hereto . . ." Appendix A simply sets forth applicable wages rates. Section 8.1, titled "Overtime," provides that "[o]vertime shall be paid at the rate of time and one-half . . . the employees' regular rate to all employees covered by this Agreement for all hours actually worked in any week in excess of forty (40) hours."

[5] I note that Mass. Gen. Laws c. 149, § 100 provides that "No person shall be required to work for more than six hours during a calendar day without an interval of at least thirty minutes for a meal." That law, however, does not create a private right of action. *See Salvas* v. *Wal-Mart Stores, Inc.*, 893 N.E.2d 1187, 1215-16 (Mass. 2008).

Offsets of time, however, present a different circumstance than that at issue in *Camara*; in *Camara,* the wages were admittedly earned by employees and then subject to deductions pursuant to an agreement between the employer and employee. Here, in contrast, the defendants assert that offsets for lunch breaks reduce the amount of time actually worked--and thus the amount of wages earned. The lunch break offsets do not represent *ex post* deductions *from* the amount of wages owed to employees (the situation in *Camara*) but an *ex ante* reduction in the wages actually earned by the employees. Thus, *Camara* does not determine the question whether lunch breaks are compensable.

In the larger analysis, however, I need not resolve here the debate about whether the lunch breaks can be offset against hours worked. Irrespective of the specific facts of *Camara*, the very existence of this debate is clear evidence of the need to interpret the CBA. The absence of guidance from either state law or the text of the CBA on this issue poses an interpretive problem that must be solved in order to determine the validity of plaintiffs' claims. The gap in the CBA must be filled by the common law--and the applicable common law is federal law.[6]

---

[6] Nothing in this statement should be taken to suggest that a state could not mandate substantive provisions in a collective bargaining agreement (such as paid breaks, minimum wages, etc.). The Supreme Court has repeatedly emphasized "that § 301 cannot be read broadly to pre-empt non-negotiable rights conferred on

"[Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law." *Lueck*, 471 U.S. at 211 (1985). This gap-filling is not mere "consultation with" the CBA, but interpretation of the terms of a contract which must be undertaken in accordance with federal law.[7] *Livadas*, 512 U.S. at 124. *See also Lueck*, 471 U.S. at 215 (rejecting state law claim implying a right of good faith; "The assumption that the labor contract creates no implied rights is not one that state law may make."); *DiGiantommaso* v. *Globe Newspaper Co., Inc.*, 632 F. Supp.

---

individual employees as a matter of state law." *See Livadas*, 512 U.S. at 123.

[7] In this regard, the present dispute is analogous to the situation faced in *Adames* v. *Executive Airlines*, 258 F.3d 7, 14 (1st Cir. 2001), in which the First Circuit held preempted disputes about how "deadheading" and "standby time" should be treated for purposes of calculating airlines workers' compensation. Although the agreement in *Adames* appears to be somewhat more fulsome regarding what constituted compensable hours, the First Circuit recognized that the agreement may still require some interpolation: "this determination may require examination of industry standards and extrinsic evidence related to the collective bargaining process" because "cases sometimes turn on 'a norm that the parties have created but have omitted from the CBA's *explicit* language, rather than a norm established by a legislature or a court.'" *Id.* (citing *Hawaiian Airlines* v. *Norris*, 512 U.S. 246, 264 (1994)) (emphasis in original). *See also Pa. Fed'n of the Bhd. of Main. of Way Employees v. Nat'l R.R. Passenger Corp.*, 989 F.2d 112, 115-16 (3d Cir. 1993) (determining whether time spent traveling between work areas was compensable required interpreting the CBA "to see exactly what the duties of employees are.")

-27-

2d 85, 88-89 (D. Mass. 2009) (holding preempted under § 301 claims "which depend on an implied obligation or duty" because determining the existence of such obligations required "review . . . of the past practices and bargaining history of the parties and, inevitably, interpretation of the CBA").

Plaintiffs contend that defendants' argument about the paid lunch breaks is a minor issue that cannot turn a state law claim into a federal one. The Supreme Court has cautioned against federal law hijacking when it held that "a defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law." *Caterpillar* Inc. V. *Williams*, 482 U.S. 386, 398-99 (1987). Plaintiffs argue that, at best, the offsets are relevant only to the question of damages.

Plaintiffs, however, far underestimate the importance of these offsets. Far from being minor or peripheral, the question whether SJ owes plaintiffs unpaid wages is the central issue in this case. The precise amount of wages owed would be a question for damages, but only after plaintiffs have established that there is any amount owed at all. "Determining whether there are wages owed," including whether "additional compensation...may offset any deficiency created by other uncompensated time" is the precise task that must be undertaken to determine whether defendants are liable under the Wage Act. *Cavallaro*, 678 F.3d at

8. The paid lunch breaks combined with data from the biometric hand scanning provided by the MBTA are, according to defendants, sufficient to show that SJ did not in fact owe plaintiffs any additional wages at all. As in *Cavallaro*, *id.*, therefore, the factual disputes about whether wages on net were owed to plaintiffs at all is neither peripheral nor relevant solely to damages but rather is central to the question of liability.

*    *    *    *    *

At this point, it is worth stepping back to acknowledge the legal and economic realities of this case. My determination that the plaintiffs' claims are preempted by federal law likely marks the end of the road for the plaintiffs' pursuit of allegedly unpaid wages. I do not believe, however, that plaintiffs' inability to vindicate their (potentially meritorious) claims represents a procedural accident. Rather, it is a function of the bargain struck by the plaintiffs' union and SJ, as well as of federal policy governing such collective bargaining agreements.

As part of the collective bargaining process, the Maintenance Contractors of New England and SEIU Local 615 agreed to a grievance procedure, set forth in Article 37 of the CBA, for resolving disputes arising from the terms of that agreement. These procedures represent a competitive bargain struck between those entities. To the extent that the SEIU Local 615 or its members relinquished valuable procedural rights, presumably they

were exchanged for something of similar value to the union's members. "The ordering and adjusting of competing interests through the process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace." *Local 174* v. *Lucas Flour Co.*, 369 U.S. 95, 104 (1962). The outcome of this bargaining process, which eschews judicial procedures in favor of arbitration, is an outcome protected and promoted by federal labor policy. *See Republic Steel Corp.* v. *Maddox*, 379 U.S. 650, 652 (1965) ("[F]ederal labor policy requires that individual employees wishing to assert grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress."); *Avco Corp.* v. *Machinists*, 390 U.S. 557 559 (1968) ("§ 301 . . . was fashioned by Congress to place sanctions behind agreements to arbitrate grievance disputes."). Allowing the plaintiffs to sidestep this procedure by bringing claims for wages owed by virtue of a CBA under the garb of a state law cause of action would undermine both federal labor policy and the bargain struck by the Maintenance Contractors of New England and SEIU Local 615.

As described above, the First Circuit has outlined two discrete categories of claims which are preempted by the LMRA. The first are claims that "allege[] conduct that arguably constitutes a breach of duty that arises pursuant to a collective bargaining agreement." *Haggins*, 648 F.3d at 55. Here, the

Massachusetts Wage Act does not establish the amount of wages or the wage rate owed to plaintiffs. Rather, that is set by the CBA above the lower applicable floor established by the Massachusetts Wage Act. In this context, therefore, the plaintiffs are seeking to employ the Massachusetts Wage Act as an enforcement mechanism for obligations that "arise[] pursuant to a collective bargaining agreement."

The second category of claims preempted by the LMRA is those whose "resolution arguably hinges upon an interpretation of the collective bargaining agreement." *Id*. Again, as discussed above, resolution of a central issue in this case--what hours count as working hours--is a question of contractual interpretation governed by federal law.

Accordingly, the claims in Count I concerning unionized plaintiffs[8] "must either be treated as a § 301 claim ... or dismissed as pre-empted by federal labor-contract law." *Lueck*, 471 U.S. 202, 220 (internal citation omitted). Here, the unionized plaintiffs in Count I have failed to pursue their claims through the grievance procedure set forth under the CBA, precluding this court from treating those claims as having been

---

[8] To the extent Count I concerns non-unionized plaintiffs, it is entirely duplicative of Count II.

brought under § 301, and dismissal is thus required. *See id.* at 220-21.[9]

## B. *The Massachusetts Wage Act Claims by the Non-Unionized Plaintiffs*

In addition to the unionized plaintiffs' wage claims in Count I, I am also presented in Count II with the wage claims of non-union plaintiffs.  Although I will dismiss the wage claims of the unionized employees because they arise under the CBA and plaintiffs have failed to pursue the required grievance procedure, I would continue to have authority as an exercise of supplemental jurisdiction, 28 U.S.C. § 1367, to retain jurisdiction over the claims of the non-unionized plaintiffs, which arise from the same common nucleus of facts as those of the union plaintiffs.  *See Senra* v. *Town of Smithfield*, 715 F.3d 34, 41 (1st Cir. 2013); *Redondo Constr. Corp.* V. Izquierdo, 662, F.3d 42, 49 (1st Cir. 2011); *Rodriguez* v. *Doral Mortg. Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995) ("In an appropriate situation, a federal court may retain jurisdiction over state-law claims notwithstanding the early demise of all foundational federal claims.").

In the absence of independent federal jurisdiction, however, I believe that it would be imprudent to maintain supplemental

___

[9] This dismissal applies to both the unionized plaintiffs, Ms. Reyes and Ms. Martinez, and to any claims on behalf of Mr. Perez and Mr. Brea arising from work they performed under the CBA-that is, before they switched to non-union positions.

jurisdiction in these circumstances.  Plaintiffs apparently intend to proceed in the form of a class action on behalf of a class of non-unionized employees.  Without making comment on either the merits of the substance or the propriety of maintaining such a class-action, I view it as inappropriate to continue to sponsor complex litigation involving only in-state residents and state law claims in a federal forum when the case is essentially at the threshold.  Accordingly, I will remand the claims of Mr. Brea and Mr. Perez to state court if the health benefit claims, to which I now turn, do not provide independent grants for federal jurisdiction.  *See Dunn* v. *Trustees of Boston Univ.*, ___ F.3d ___, 2014 WL 3733984 at *3 (1st Cir. July 30, 2014) (acknowledging that § 1367 permits remand to state court of remaining state law claims).

## C.    *Health Benefit Claims*

The non-unionized plaintiffs, Mr. Brea and Mr. Perez, have asserted a claim for defendants' failure to provide promised healthcare benefits.  The plaintiffs have pled this as a Wage Act claim or, alternatively, as a violation of ERISA.  Defendants contend that such a claim may not be maintained under the Wage Act, both because ERISA would preempt such a claim and because the Wage Act does not encompass a failure to provide promised health benefits.  In addition, defendants contend that plaintiffs' claim under ERISA fails on the merits.

ERISA § 514(a) preempts all claims that "relate to" an ERISA benefit plan. 29 U.S.C. § 1144(a). The ERISA preemption provision is "conspicuous for its breadth." *FMC Corp.* v. *Holliday*, 498 U.S. 52, 58 (1990). The Supreme Court has recognized the difficulty posed by ERISA's "relates to" language:

> The governing text of ERISA is clearly expansive .... [O]ne might be excused for wondering, at first blush, whether the words of limitation ("insofar as they ... relate") do much limiting. If "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course for, [r]eally, universally, relations stop nowhere ... [W]e have to recognize that our prior attempt to construe the phrase "relate to" does not give us much help drawing the line here.
> *New York State Conf. of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).

Here, the plaintiffs allege that SJ violated the Massachusetts Wage Act when it failed to provide non-union, full-time employees health insurance benefits that they were due under the terms of their employment. They are seeking damages, injunctive relief, liquidated damages, and attorneys' fees and costs. Plaintiffs argue that their Wage Act claims are not preempted by ERISA because the dispute does not arise under the plan--rather, they were denied benefits in their entirety because they were never given access to the plan. They contend that I therefore need not interpret SJ's health insurance plan at all to determine liability.

Plaintiffs cite *Boston Children's Heart Foundation, Inc.* v. *Nadal-Ginard* for the principle that a case is not preempted by

ERISA when a "legal determination that [a defendant's] conduct constitutes a fiduciary breach does not require the resolution of any dispute about interpretation or administration of the plan." 73 F.3d 429, 440 (1st Cir. 1996). Looking more closely at *Nadal-Ginard*, however, it is apparent that the legal determinations in that case were much further removed from the plan itself than they are here. *Nadal-Ginard* was a dispute between a non-profit corporation and its former president who was alleged to have violated his fiduciary duties by misrepresenting information to induce the board to adopt a particular severance benefit plan that provided him with significant personal benefits. 73 F.3d at 438.

The damages in *Nadal-Ginard* were determined under Massachusetts law, based on the premise that a court can require a person who violated his fiduciary duties to forfeit all of his compensation and may consider equitable offsets. *Id.* at 435-36. In contrast, this case is a dispute between an employer and an employee about whether the employer wrongfully withheld access to health care benefits provided through an ERISA plan that the employees had been promised access to as part of their compensation.

The First Circuit has acknowledged confusion about the scope of preemption, particularly when there are allegations of misrepresentation. *Carlo* v. *Reed Rolled Thread Die Co.*, 49 F.3d

790, 793 (1st Cir. 1995).  Nonetheless, the First Circuit has
"consistently held that a cause of action 'relates to' an ERISA
plan when a court must evaluate or interpret the terms of the
ERISA-regulated plan to determine liability under the state law
cause of action...[and] that ERISA preempts state law causes of
action for damages where the damages must be calculated using the
terms of an ERISA plan."  *Hampers* v. *W.R. Grace & Co.*, 202 F.3d
44, 52 (1st Cir. 2000).  In *Carlo*, for example, the First Circuit
held that the plaintiff's misrepresentation claim against his
employer was preempted because he sought damages that "would
require the court to refer to the [plan] as well as the
misrepresentation allegedly made by [the employer].  Thus, part
of the damages to which the [plaintiffs] claim entitlement
ultimately depends on an analysis of the [plan]."  49 F.3d at
794.  Similarly, in *Hampers*, the First Circuit noted that the
plaintiff "measured his damages by reference to" an ERISA plan to
which he claimed he was wrongfully denied access.  202 F.3d at
52.

     This case does not require me to parse the language and
terms of coverage for particular health-related expenses, because
the claims are not about the denial of a particular benefit under
the plan.  However, I doubt that I could find that SJ wrongfully
denied health insurance benefits to the non-union plaintiffs
without looking to the terms of eligibility and enrollment

requirements specified under the plan. Even clearer is the fact that I would need to look to the plan to determine damages. Plaintiffs are seeking damages and injunctive relief, both of which can only be determined by reference to the benefits that plaintiffs should have received in the absence of any misconduct on the part of SJ. Any other measure of damages would be based on pure speculation. *Carlo*, 49 F.3d at 794. Resolution of this case would require me to look to the plan at least to determine damages, and likely liability as well, and therefore plaintiffs' state law claims are preempted by ERISA § 514(a).

I turn now to the ERISA claim, which plaintiffs pled in the alternative, to determine whether this claim can survive defendants' cross-motion for summary judgment. I consider the facts in the record in the light most favorable to the nonmoving party, here the plaintiffs. *McGrath* v. *Tavares*, 757 F.3d 20, 25 (1st Cir. 2014). I previously took defendants' motion to dismiss for failure to state a claim under advisement, providing plaintiffs with an opportunity to flesh out their claims through discovery. With respect to the healthcare benefit claims, they have not done so.

The ERISA claim here concerns SJ's capacity as fiduciaries under ERISA. After discovery, plaintiffs own proposed undisputed facts are that (1) Mr. Brea and Mr. Perez received the March 2012 Health Insurance Open Enrollment Package Receipt on February 21,

2013 [PSUF ¶¶ 43, 44]; (2) non-union thirty-hour employees are eligible to purchase health insurance through SJ, for which SJ pays half of the premium [Id. at 45, 46, 48, 50]; (3) employees become eligible for health benefits on the first day of the month after sixty days of eligible employment [Id. at 47]; (4) Mr. Brea claims he has worked over 30 hours a week since July 2010, but there is no dispute that he did so as of November 2011. He continues doing so today [Id. at 51]; and (5) Mr. Perez began working more than 30 hours a week in July 2012 and continues doing so today. [Id. at 52].

Significant gaps remain in these factual allegations. The fact that Mr. Brea and Mr. Perez were eligible to enroll in health benefits but did not receive benefits does not plausibly demonstrate that SJ violated its fiduciary duties. The record shows, and the parties do not dispute, that both Mr. Brea and Mr. Perez were informed that they were eligible for benefits once they started working a full time schedule. There is no dispute that Mr. Brea never spoke with anyone else about health insurance benefits after he was told he would be eligible.  Mr. Perez testified that he became eligible for health insurance benefits in July 2012, the same month this suit was filed, and that he later inquired of his supervisor once again about whether he would get health insurance benefits and he was told he would, but the

supervisor did not know when.  There is no evidence that Mr.

Brea or Mr. Perez ever took steps to enroll in SJ's health

plans (until Mr. Brea signed up for health benefits in

February 2013, at which point Mr. Perez declined coverage)

or that they were ever told that they were not in fact

eligible after they began working over thirty hours a week.

The plaintiffs have not fully developed their position about

the precise nature of the fiduciary breach under ERISA,[10]

but the mere facts that plaintiffs were eligible, were told

they were eligible, and did not receive benefits simply do

not add up to a claim for violation of a fiduciary duty.

Even after discovery, plaintiffs have not marshaled facts

that could lead a trier of fact reasonably to resolve this

issue in their favor; consequently, I will grant SJ's motion

for summary judgment on the ERISA claim.

## C.    *Plaintiffs' Motion to Strike Defendants' Rule 68 Offers.*

Plaintiffs have moved to strike (or rule ineffective)

---

[10]    To the extent plaintiffs allege a violation of ERISA's
notice provisions, these "generally do not give rise to
substantive remedies outside § 1132(c) unless there are some
exceptional circumstances, such as bad faith, active concealment,
or fraud." *Watson* v. *Deaconess Waltham Hosp.*, 298 F.3d 102 (1st
Cir. 2002).  Plaintiffs do not specify that they are pursuing a
claim under § 1132(c) and the evidence before me does not support
one.  While the evidence before me suggests that two employees
were unsure of how to sign up for benefits for which they were
told they were eligible, it does not support a finding that SJ
actively concealed its policy or intentionally obfuscated the
process.

the defendants' offers of judgment under Rule 68 of the
Federal Rules of Civil Procedure. The four plaintiffs
brought claims under the Massachusetts Wage Act and other
provisions not only on behalf of themselves but as
representatives of a putative class of similarly situated
people. Plaintiffs were presented with a Rule 68 offer of
judgment on August 30, 2013, the eve of their deadline to
file the motion for summary judgment as I directed them to
do. The terms of this Rule 68 offer have not been
disclosed. Plaintiffs contend, however, that it is
inappropriate to use offers under Rule 68 to "pick off"
individual named plaintiffs who may be tempted to accept the
offer prior to a motion for class certification.

I believe that my ruling with respect to the cross
motions for summary judgment may render this motion to
strike moot, except perhaps as to the wage claims of non-
unionized employees, which I will remand. However, given
the precertification procedural posture of the case at the
time of the motion to strike, I wish to record my concern by
granting the motion on grounds that it would be
inappropriate to invoke the cost shifting mechanism of Rule
68 when a case involving putative claims of aggregate
representation is at this stage. As Judge Scirica has
explained, the application of Rule 68 "is strained when an

offer of judgment is made to a class representative" because such an application threatens to undermine the class action procedure put in place by Rule 23. *Weiss* v. *Regal Collections*, 385 F.3d 337, 344 (3rd Cir. 2004). A rule allowing the named plaintiff to be "picked off" by making an offer of judgment would frustrate the objectives of wage act statutes and the purpose of collective action provisions. *See Sandoz* v. *Cingular Wireless, LLC*, 553 F.3d 913, 918 (5th Cir. 2008). I believe that this logic holds, not only when a Rule 23 motion is pending, or has been acted upon, but at early precertification stages of aggregate litigation as well. Accordingly, to the extent that it is not already moot, I will grant plaintiffs' motion to strike.

### IV.  CONCLUSION

For the reasons set forth more fully above, plaintiffs' motion for summary judgment (Docket No. 53) is DENIED. Defendants' cross motion for summary judgment (Docket No. 64) is GRANTED as to Count I and Count III. The remaining claims under Count II are hereby REMANDED to State Court. Plaintiffs' motion to strike (Docket No. 61) is GRANTED.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT